IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
January 26, 2017 Session

## IN RE: KARISSA V., ET AL.

**Appeal from the Chancery Court for Roane County**
**No. 2014-AD-457     Frank V. Williams, III, Chancellor**

_____

## No. E2016-00395-COA-R3-PT

_____

This appeal concerns the termination of parental rights. Glenn V. ("Grandfather") filed a petition in the Chancery Court for Roane County ("the Trial Court") seeking to terminate the parental rights of his son, Christopher V. ("Father"), and Makara G. ("Mother") to their minor children, Karissa and Makilee ("the Children"). After a trial, the Trial Court terminated Father's and Mother's parental rights on the grounds of abandonment by failure to support and failure to visit. The Trial Court also granted Grandfather's motion for adoption. Father and Mother filed appeals to this Court. We, *inter alia*, reverse the ground of failure to visit with respect to both parents. We also reverse the ground of failure to support with respect to Mother. However, we affirm the ground of failure to support with respect to Father. We find further that termination of Father's parental rights is in the Children's best interest. We affirm, in part, and reverse, in part, the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed, in Part, and Reversed, in Part; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR. and THOMAS R. FRIERSON, II, JJ., joined.

Zachariah Stansell, Knoxville, Tennessee, for the appellant, Christopher V.

Mark N. Foster, Rockwood, Tennessee, for the appellant, Makara G.

Martin W. Cash, Jr., Kingston, Tennessee, for the appellee, Glenn V.

# OPINION

## Background

This case concerns the termination of Father's and Mother's parental rights to the Children, Karissa and Makilee, born 2011 and 2013 respectively. Both of the Children were born exposed to drugs. The Children were placed in the temporary custody of Father's father, Grandfather. On December 5, 2014, Grandfather filed a petition seeking to terminate Father's and Mother's parental rights to the Children and for adoption of the Children. In July 2015, Grandfather filed an amended petition to terminate parental rights.

Mother, upon a finding of indigency, was appointed counsel. In a July 2015 motion, Mother's counsel requested that she be permitted to withdraw from the case citing "irreconcilable differences." Mother's counsel expressed frustration as shown in her billing records at Mother's alleged failure to communicate with her. The Trial Court, however, never entered an order disposing of the motion to withdraw. Mother's counsel texted Mother in the lead-up to trial. A month or so before trial, Mother's counsel attempted to call Mother and left a message. Mother did not appear at the February 2016 trial. Mother's counsel elected to proceed with the case despite Mother's absence.

Grandfather testified at trial. Grandfather, 45, was a concrete finisher by trade and a small business owner. Grandfather testified that he had taken custody of the Children via court order. Grandfather stated that he kept a detailed visitation log for Mother's visits. Grandfather proceeded to recount the dates Mother missed visitation in the relevant four-month period prior to the filing of the petition, although there was confusion in the testimony as to whether Mother missed 17 visits or visited 17 times. Grandfather testified that Mother had paid him no child support from August 2014 onward. Regarding Father, Grandfather kept no detailed visitation log, but stated that Father visited "[n]ot as much as . . . the Court ordered." Grandfather stated that when Father did visit he mostly texted and paid little attention to the Children. Grandfather stated that Father paid him no child support, and that, in fact, Grandfather had paid certain bills for Father. Grandfather stated that Father now was living in an apartment with a girlfriend. Grandfather also testified to an incident when he found Father sticking a needle in his arm.

Grandfather testified that Father worked for him periodically over the years. Grandfather testified:

Q. When did Chris work for you?

A. Well, he just works periodically. I mean, he's -- I mean, I couldn't call him really a steady employee.

Q. Why not?

A. You know, he's -- throughout his whole life, whenever he's turned 18, he's could have had a job, and he's failed to do so.

Q. So when has he worked for you?

A. Well, periodically throughout his -- until he was 17, 18, until he got out of school. I mean, he --

Q. So in 2014, when did he work for you? Rough dates or exact.

A. I think -- 2014, I don't think he worked much with me at all.

Q. What about 2013?

A. Not much. Very, very, very little at all.

Q. 2012?

A. Very little at all.

Q. 2011?

A. Very little at all.

Q. 2015?

A. He's picked up to -- I could say probably three out of -- days a week.

Q. Every week?

A. Well, no. This is '16. I'm sorry, I've got my years mixed up. I'd say probably -- well, I'd really have to look at my records. Probably I think I sent him some tax thing last year, 2015, he might have made $2,300.00. Let's do it that way. That way I can remember that.

Q. The tax thing you sent him for the year before that, was it more or less?

A. I think it was less.

Q. The reason why I ask is that we had multiple days of hearings in the lower Juvenile Court, do you remember those?

A. Yes.

Q. And every time we had those, you testified that he was working for you at that time, so that's why I'm asking about when was he working, since you said that he would work with you some. But every time we've been in court before, you said he was working with you. Was he only working around the court dates, was he working between the court dates?

A. Well, it seemed like every time we had to go to court, he would work more.

Q. And that's your perception of it?

A. Yeah, that's pretty much.

***

-3-

Q. So as we're sitting here today, you can't really say when Chris has worked with you like how many days he's worked with you the past several years?

A. No, not without looking at something. But, no, I mean, I could go back to the records. I know last year, like his tax, because I do them, and I have the tax lady do them, and I mail them out and I look at them, you know. He might have made a couple thousand dollars last year. He gets $10.00 and $12.00 an hour, so, you know, you can figure that out on your finger, I guess, how much money that is, how much he's worked.

Q. Has that been consistent through the past nine years?

A. Yes.

Q. Because you said he's been working since he was 17. You said you believe he's 26?

A. Yes.

Q. That would be nine years?

A. Yeah.

Q. And so you think he's worked enough to make a couple thousand dollars every year since he was 17?

A. Yes, pretty close, yeah.

Grandfather testified that there was no court order establishing Father's child support. Grandfather stated further that prior to the filing of his petition he never asked Father to pay child support. In response to a question about visitation, Grandfather agreed that Father and Mother visited "substantially" although "not as much as they were allowed." When asked why he filed a petition to terminate parental rights, Grandfather testified:

Because the parents ain't getting no better at all. And I mean, we keep getting, like I say, evidence and everything that looks toward they're not getting well. And again, these kids need love, safe environmental home that they can grow up and be children and have something in life whenever they grow up and get older.

Denee Foisy, a social worker who had worked with Mother, testified as follows:

Q. In terms of parenting skills, do you consider somebody who has been in and out of jail a proper parent?

A. All I could tell you is on what I witnessed, because I can't give professional advice on whether or not I think she should be a parent or not for those children. But all I can tell you is what I observed. And what I observed, she looked really good from what I saw. She didn't need any parenting.

Robert T., an acquaintance of Mother's, testified. Robert T., wishing to help Mother given her difficult work and family circumstances, had provided Mother with a cell phone to use and planned to hire her as a secretary. Robert T. stated that he told Mother that she was not to engage in any illegal activity on the phone. Robert T. testified that Mother nevertheless stole about $300 from him. Robert T. retrieved the phone from Mother. At some point, the police confiscated the phone. Robert T. testified to text messages he found on the phone that Mother used regarding drugs sales, including "30 is 750. That covers the cost in full. The rest should be split. I'm tired of being given the short end all the time." Another text read: "OK then you owe me two pills from who ever takes you then. You know we sell 40 of them at $20 each to 1 person the second we get them, to get our $ back." Mother's counsel objected strenuously to admitting the text messages. Mother's counsel argued that they were not properly authenticated, and that, for all anyone knew, Robert T. sent them himself. Mother's counsel pointed out that Mother was not present to refute Robert T.'s account, to which the Trial Court stated "it would behoove [Mother] to show up to Court," Robert T. testified that the messages had originally been deleted, but that "the law" had pulled them back up. Robert T. testified:

Q. Now, when did you -- I think you testified that you retrieved the cell phone. What were the circumstances when you retrieved the cell phone?
A. I told you, the phone alerted me that the data was going over and I confronted her about it and she tried to deny it. And I said, well, you know, part of it was letting me look at the phone. She said, well, come and get it. And then I come up there and got it and she had deleted everything off of it.
Q. She deleted everything?
A. (Witness nods head.)
Q. And when exactly, it's an approximation, you said around August 11th?
A. 12th I think it was.
Q. And so all of her text messages were deleted?
A. Yeah. I got my phone set up to where I can go through my phone and pull records from hers.
Q. And so you were able to pull up this August 10th text message?
A. It actually pulled everything up for August, period.
Q. And August 9th, correct?
A. (Witness nods head.)
Q. And those were the only text messages that you found on her phone?
A. No, they wasn't on her phone. They were on mine. The law is the one that pulled that stuff up.
Q. So you actually had control over her text message?
A. What are you getting at? Just ask me the question you're going to ask me.

THE COURT: No, you just -- you're answering. She's asking, you answer.

THE WITNESS: Yes, sir.

Q. What made you decide to retrieve the telephone?

A. I told you, when the phone alerted me about the data message and I confronted her about it and she said it wasn't true, to come get the damn thing.

Q. Does your carrier send you any type of written alert or do you have any proof that you were alerted about --

A. It come over the phone.

Q. I'm sorry?

A. It's through the phone. It's Verizon.

Q. Do you have any billing statement from your carrier?

A. I can get it if that's what you want.

Q. Well, I'm asking you if you have it today, sir?

A. No, ma'am. I wasn't told to bring any of that.

Q. So she deleted all of the text messages except for the specific text messages --

A. They were pulled back up on the telephone. How many times do I have to say that? She deleted everything off the phone, phone numbers, everything.

Q. And how were you able to retrieve those and not any others?

A. It pulled all of them up. They were all there. I didn't go through them. The law looked at them.

Q. I'm sorry?

A. When you all had access to the phone, you could see everything that was on it.

Q. Yes, but the only ones that you specifically produced were those two text messages --

A. I didn't specifically produce them, they did.

Q. Mr. [T.], I'm saying, what other criminal activity text messages did you pull up?

A. The drug activity.

Q. And where are they here today?

A. They're right there. They've got copies of them. The law has got copies of them. The Court's got copies of them.

Q. We have one text message to a person named Kelly on August 10th and we have one text message to Makara's father on August 9th. Those are the only two allegedly criminal activity text messages.

A. You all had the phone. Why didn't you all bring it along?

Q. Why haven't you been able to produce any additional text messages?

A. They were there. It wasn't my job to bring them all.

Q. So why didn't you?
A. I'm not the one that done it, lady.

One of the recipients of a text, Clara P., testified that she did not recall receiving the text.

Father testified.  Regarding work and visitation, Father stated:

Q. Were you getting your standard visitation during those months, August through December of 2014?
A. Yeah, as long as I could get a ride over to his house or he would come get me.
Q. Did you have a lot of problems getting there?
A.  Yeah, sometimes.

***

Q. When you were working for your father, did you have an agreement with him that he would take some money out of your check to help with the kids?
A. It wasn't not with the two kids he has. It's with my other two I have with Amber. He was keeping money out of my check so I could pay my child support.
Q. He was helping you with the child support?
A. Yes, sir.
Q. Did he ever ask you for child support?
A. No, sir.
Q. Did you two ever talk about child support?
A. No, sir.  But for the record, he said that I haven't never bought anything for the kids or anything like that.  I have bought clothes, I have bought shoes, and I bought milk on several occasions.

***

Q. You say you visit your kids when you go over to your dad's before work and you visit with your kids when you come home from work until you have to go back home; is that true?
A. Or sometimes I'll stay and he'll take me home.
Q. Do you ever see your kids on the weekends?
A. Yes.
Q. How do you get there?

A. Either I'll get a ride, someone to drop me off, or he'll come get me, and then we go pick up my other two kids and I spend all day with them.
Q. You testified that -- or your dad testified that money is taken out of your paycheck to give child support for the two kids that you had with Amber []; is that correct?
A. Correct.
Q. Why don't you pay child support to your dad for the two kids you had with [Mother]?
A. Because he told me he didn't need it. We've talked about it before.
Q. Are you aware that the obligation to pay child support is never ending and that regardless of whether your dad wants it, you have the obligation to pay child support?
A. Well, he pays me. If he wanted, he could take it out of my check.

In March 2016, the Trial Court entered an order terminating Mother's and Father's parental rights to the Children on the grounds of willful failure to support and willful failure to visit. The Trial Court also granted adoption of the Children to Grandfather. The Trial Court found and held as follows:

THIS CAUSE came on to be heard on February 19, 2016 before the Court on the Petition to Terminate Parental Rights and For Adoption of Minor Child and the Supplemental Petition to Terminate Parental Rights and For Adoption of Minor Child, and appearing before the Court were counsel for all parties, the Guardian ad Litem, the Petitioner and his witnesses, the Respondent [Father], and the Respondent [Mother's] witnesses. The Respondent [Mother] did not appear for trial. Following receipt of testimony and exhibits, argument of counsel and upon review of the entire record as a whole, the Court finds as follows:
1. The Petitioner is a resident of Roane County, Tennessee. He is the paternal grandfather of both minor children Karissa [V.] and Makilee [G.]. He has custody of the minor children pursuant to Orders entered by the Juvenile Court of Roane County, Tennessee.
2. The Petitioner is a suitable custodian of the children. The requirement for homestudy and waiting period are hereby waived since the Petitioner is related to the minor children.
3. All persons entitled to notice of these proceedings have been served with process and were properly before this Court.
4. Based upon the clear and convincing proof presented at trial, the Court finds that the parental rights of both Respondents to the minor children are hereby terminated. The Respondents have abandoned the minor children. The Court finds this to be a clear cut case. Abandonment

has been shown by facts that existed during the four months preceding the filing of the adoption petition, which was December 5, 2014. The Court finds by clear and convincing evidence that there was virtually zero support on the part of the biological parents. There was nothing coming from them to support their children. The children were being supported by the Petitioner.

The next issue is the lack of any effort to have contact with the children, to visit them, or to communicate with them, or to have some meaningful interaction with the children. Respondent [Father] was around the Petitioner on occasions and just perhaps was around the children when the Respondent [Mother] was not present. It is apparent to the Court that the Respondents' contact with the children came about only when it was convenient for the Respondents to have contact with the children and it was limited. The occasions when visitations occurred were perfunctory. The Court finds that both Respondents were perfectly happy to let others, particularly the Petitioner, carry the burden that they, by nature, were and should have carried. The Respondents did this so that they could do as they pleased. They could come and go, be with friends, engage in activities that they wanted to engage in. They essentially were with the children only when it suited them, which was not often and not as scheduled.

The Court has listened to the witnesses and everything the Court has heard favored the Petitioner. The Petitioner did not interfere with visitations. He has pursued this Petition because of the affection of a grandparent for his grandchildren and is determined to do what he can to save them.

Respondent [Mother] has not appeared before the Court today. The Court has not had the opportunity to look at her. The Court has looked at Respondent [Father] and sees no indication whatsoever that there is ever going to be a day or a year in his life when he is ever going to have his feet firmly planted on the ground, when he is ever going to be a responsible, productive citizen and parent. He is not willing to get out and do what it takes to produce more income so that someday he may have a home of his own and his own car and his own place apart from his girlfriend and her mother and her boyfriend. The Court finds Respondent [Father] to be unable to function in the real world, convicted of selling and manufacturing Schedule II narcotics and still on probation after four years for committing a felony, a drug addict. And as the Court looked at him today, the Court kept thinking he sure looks mighty subdued, mighty sedated, calm, and unusually calm. He is facing a lawsuit depriving him of custody of his children and he is so cool and calm. How did that happen?

Respondent [Father] was ordered to take a hair follicle drug test which he did not take. It is therefore up to him to show that he is clean, that he has not taken any drugs. Further, because of his history, because of the fact that he was into drugs, he was convicted of drug use, a crime, a felony, he was convicted of activity that would be, if not interrupted, not stopped, would be a substantial threat not only to his own life but to the lives of his children. At least twice he has admitted using marijuana while on probation which would be violation of his parole right there.

The argument was made that the Court cannot do anything to Respondent [Mother] because there has to be a showing of willfulness on her part. But if someone is into drugs they cannot make that claim. A person who is into drugs the way these two respondents have been into drugs, at some point, they become incapable of being believed in what they say and the only thing that counts for anything is to show us a changed life, no words, but a new life. The Court heard some potentially flattering words from Denee Foisy, BSW about the Respondent [Mother], but then the Court wondered where Respondent [Mother] was. If she has no concerns why is she not here? Why did she abandon the Courtroom to her lawyer to go it alone with her friends, others who apparently were willing to come to testify about things she should have been if she is who counsel claims her to be? Further, Respondent [Father] is not a victim. He may have been somewhere back in time, but at some point you have to man up, you have to take control and be a different person. Both Respondents have to change their minds about who they are and the way they are going to live. And, until they do that, they are not getting any better. Reviewing their drug use the Court imputes willfulness to the Respondents on account of their abuse of illegal drugs.

The Court does not doubt that the children love Respondent [Mother]. The Petitioner has not interfered with anybody. The visitation has been only token visitation, which as far as the Court is concerned, has been meaningless because it does not indicate any sort of real parent type of commitment to and affection to the children.

5. The Court further finds that it is in the children's best interest for the adoptions to occur. The Court finds no problems with Petitioner [Grandfather]. He presents himself as perhaps a changed man himself, because he has admitted to some things that he has done younger and earlier in life. He runs his own business and hires multiple people, he produces jobs and has a good home. He provides hope for these children.

6. The children were not brought into the State of Tennessee and therefore there is no issue with compliance with the ICPC.

7. This children's adoptions are not subject to the provisions of the Indian Child Welfare Act (ICWA), 25 U.S.C. section 1901 et. seq.

8. These children have not been the subject of an adoption decree in a foreign country.

9. The Petitioner is a fit and proper person to have the care and custody of the children.

10. The Petitioner is financially able to provide for the children.

11. This children are suitable for adoption and this adoption is in the children's best interest.

12. This Honorable Court approves the fees charged in this cause.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1. The Respondent [Father's] parental rights to the minor children are hereby terminated.

2. The Respondent [Mother's] parental rights to the minor children are hereby terminated.

3. The prayer for adoption is hereby granted and the minor children are hereby adopted by Petitioner [Grandfather].

4. Karissa [V.'s] name shall not be changed. Makilee [G.'s] name is hereby changed to Makilee [V.].

5. The fees in connection with this cause are reasonable and therefore approved retroactively.

6. Counsel for the Respondent [Father] is hereby granted leave to withdraw and shall have no further legal responsibility in this matter. Counsel for the Respondent [Mother] is hereby granted leave to withdraw and shall have no further legal responsibility in this matter. Alvin Cohen has been appointed as the Guardian ad Litem in this cause and is therefore relieved of his duties herein.

7. The Court costs are hereby assessed against the Petitioner.

Mother and Father filed appeals to this Court.

## Discussion

Though not stated exactly as such, Father raises the following issues on appeal: 1) whether the Trial Court erred in finding the ground of failure to support; 2) whether the Trial Court erred in finding the ground of failure to visit; 3) whether the Trial Court erred in finding the ground of persistent conditions; and, 4) whether the Trial Court erred in finding that termination was in the Children's best interest. Mother raises her own issues slightly reformulated by us as follows: 1) whether the Trial Court erred in permitting the trial to proceed in Mother's absence and whether Mother was denied effective assistance

-11-

of counsel; 2) whether the Trial Court erred in finding the ground of failure to visit; 3) whether the Trial Court erred in admitting certain text messages; 4) and, whether the Trial Court erred in finding the ground of failure to support.

As our Supreme Court recently instructed:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[1] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455

[1] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[2] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303

---

[2] Tenn. Code Ann. § 36-1-113(g)(1)-(13).

S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[3] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at

---

[3] Tenn. Code Ann. § 36-1-113(i).

246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Our Supreme Court, however, has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re: Carrington H.*, 483 S.W.3d at 525-26 (footnote omitted). As such, we review each of the grounds for termination.

As pertinent, Tenn. Code Ann. § 36-1-113(g)(1) provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1) (Supp. 2016).[4]

As pertinent to this appeal, Tenn. Code Ann. § 36-1-102 provides:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i)      For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

Tenn. Code Ann. § 36-1-102(1)(A)(i) (Supp. 2016).

Regarding failure to support, this Court has stated:

In a termination proceeding, the burden is not on a parent to demonstrate an inability to pay; the burden is on the petitioner to prove by clear and convincing evidence that the parent had the capacity to pay, made no attempt to do so, and had no justifiable excuse for not doing so. *In re Adoption of Angela E.*, 402 S.W.3d at 641. It is not enough for a petitioner to "simply prove that [the parent] was not disabled during the relevant timeframe" and therefore assume that he or she was capable of working and paying child support. *In re Josephine E.M.C.*, No. E2013-02040-COA–R3-PT, 2014 WL 1515485 at *18 (Tenn. Ct. App. Apr. 17, 2014), *perm. app. denied* (Tenn. July 23, 2014).

*In re: Heaven J.*, No. W2016-00782-COA-R3-PT, 2016 WL 7421381, at *7 (Tenn. Ct. App. Dec. 22, 2016), *no appl. perm. appeal filed as of Feb. 22, 2017*.

---

[4] We cite herein to the Tennessee Code Annotated 2016 Supplement. No material changes were made to the relevant portions of Tenn. Code Ann. §§ 36-1-113 or 36-1-102 since the events of or hearing in this matter.

Regarding failure to visit, this Court has stated:

> A parent's willful failure to visit the child "means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). Token visitation is defined as "visitation, under the circumstances of the individual case, [that] constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(c).
>
> ***
>
> The Supreme Court has held that "a parent who attempted to visit and maintain relations with his child, but was thwarted by the acts of others and circumstances beyond his control, did not willfully abandon his child." *In re A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007) (citing *Swanson*, 2 S.W.3d at 189). However, "[a] parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child." *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009) (citation omitted).

*In re: Kenneth G.*, No. M2016-00380-COA-R3-PT, 2016 WL 4987475, at **6-7 (Tenn. Ct. App. Sept. 15, 2016), *no appl. perm. appeal filed*.

We first address Father's issues, beginning with whether the Trial Court erred in finding the ground of failure to support. Father testified that he gave some items to the Children such as clothes and milk. Otherwise, the evidence was clear that Father never paid any support. Father's non-payment alone is insufficient to establish the requisite willfulness on his part necessary to establish this ground. The Trial Court stated regarding both parents: "Reviewing their drug use the Court imputes willfulness to the Respondents on account of their abuse of illegal drugs." We reject this line of reasoning. Although illegal drug abuse and the purchase or sale of illegal drugs may well be relevant to determining whether a parent willfully has failed to support his or her child while supporting his or her drug use, illegal drug activity by itself does not establish willfulness. There is no statutory or case law basis for the Trial Court's imputing "willfulness to [Mother and Father] on account of their abuse of illegal drugs." Grandfather retained the burden of proving willfulness.

The Trial Court, however, was on point when it found: "[Father] is not willing to get out and do what it takes to produce more income so that someday he may have a

home of his own and his own car and his own place apart from his girlfriend and her mother and her boyfriend." The evidence in the record is clear and undisputed that Father worked for Grandfather intermittently for years. Neither Father nor Grandfather could give precise times that Father worked. However, Grandfather stated that Father earned $10 to $12 per hour, and earned approximately two thousand dollars per year. Grandfather also testified that Father would work more around the time of court dates. Father himself testified to a certain lack of alacrity in seeking better employment. In short, the record clearly shows that Father was capable of working, that he did work, and yet he never paid any child support to Grandfather for the Children.

We recognize that this is a somewhat unusual set of circumstances in that the parent whose parental rights are at stake was employed by the person seeking to terminate his parental rights. Father testified that Grandfather told him not to worry about child support. Grandfather disputed Father's account. Even so, that would not absolve Father of his obligation to contribute to the Children's support. We find and hold, as did the Trial Court, that the ground of willful failure to support was proven against Father by clear and convincing evidence. We affirm the Trial Court on this issue.

We next address whether the Trial Court erred in finding the ground of failure to visit as to Father. The Trial Court found: "It is apparent to the Court that the Respondents' contact with the children came about only when it was convenient for the Respondents to have contact with the children and it was limited. The occasions when visitations occurred were perfunctory." There is some evidence in the record to suggest that Father's visits with the Children sometimes were not very meaningful as he played on his cell phone throughout those visits. However, Grandfather himself testified that, while he did not keep detailed logs of Father's visits, Father did visit many times. At one point in his testimony, Grandfather even used the term "substantially" to describe the visits. We find that the evidence relevant to the Trial Court's findings on the issue of Father's alleged willful failure to visit does not rise to the level of clear and convincing. We reverse the Trial Court on this issue.

We next address whether the Trial Court erred in finding the ground of persistent conditions as to Father. The ground of persistent conditions was alleged in Grandfather's petition, but the Trial Court never ruled on it. The Trial Court's final order terminating Father's parental rights does not mention "persistent conditions" or any variation of the term or the necessary elements thereof. Trial courts should rule on all grounds alleged in parental termination proceedings. We do not believe, however, that remand would be a proper remedy in this case. Grandfather does not attempt to rely upon persistent conditions in his argument on appeal. The effect of the Trial Court's failure to rule on persistent conditions is that Father is not subject on this appeal to his parental rights being terminated on the ground of persistent conditions.

-18-

Father's final issue is whether the Trial Court erred in finding that termination was in the Children's best interest. The Trial Court's final order contains findings on point with respect to the Children's best interest. The evidence reflects that Father has a very limited relationship with the Children, and that he is not truly self-sufficient so as to be able to raise the Children. Indeed, Grandfather already is deducting money from Father's earnings to support Father's two other children. We also are not unmindful of the evidence produced at trial concerning Father's history of illegal drug use. Meanwhile, the evidence in the record is that the Children are doing well with Grandfather and that Grandfather is a suitable caregiver. We find and hold, as did the Trial Court, that the evidence is clear and convincing that termination of Father's parental rights is in the Children's best interest.

We next address Mother's issues, beginning with whether the Trial Court erred in permitting the trial to proceed in Mother's absence and whether Mother consequently was denied effective assistance of counsel. Our Supreme Court held in *In re: Carrington H.* that, while there are numerous special safeguards in parental termination cases including a right to counsel, there is no right to *effective* counsel in these cases. Our Supreme Court stated:

> By refusing to import criminal law post-conviction type remedies, we do not at all disregard the well-established constitutional principle precluding the termination of parental rights except upon fundamentally fair procedures. But this constitutional mandate can be achieved without compromising the interests of children in permanency and safety. "By its very nature, 'due process negates any concept of inflexible procedures universally applicable to every imaginable situation.' " *Heyne v. Metro. Nashville Bd. of Pub. Educ.*, 380 S.W.3d 715, 732 (Tenn. 2012) (quoting *Cafeteria & Rest. Workers Union, Local 473 AFL–CIO v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961)). Tennessee court rules, statutes, and decisional law are already replete with procedures, some previously described herein, designed to ensure that parents receive fundamentally fair parental termination proceedings.
>
> ***
>
> Given these existing procedural safeguards, we decline to hold that securing the constitutional right of parents to fundamentally fair procedures requires adoption of an additional procedure, subsequent to or separate from an appeal as of right, by which parents may attack the judgment

terminating parental rights based upon ineffective assistance of appointed counsel.

*In re: Carrington H.*, 483 S.W.3d at 533, 535.

On October 3, 2016, a petition for writ of certiorari was denied by the Supreme Court of the United States in *Vanessa G. v. Tennessee Dep't of Children's Services*, an attempt to appeal *In re: Carrington H.* Therefore, *In re: Carrington H.* is truly final and binding on this Court. Mother's argument that she is entitled to relief because her counsel was ineffective is unavailing. Our Supreme Court has held, with the U.S. Supreme Court declining to review, that, as opposed to in criminal matters, there is no mechanism to seek relief based upon alleged ineffective assistance of counsel in parental termination cases.

Mother, however, under *In re: Carrington H.* was entitled to "fundamentally fair procedures . . . ." Given this record, we conclude that Mother was not subjected to fundamental unfairness in the parental termination proceedings when the trial proceeded in her absence. While the Trial Court never entered an order on Mother's counsel's motion to withdraw, Mother's counsel remained on her case and represented Mother at trial in Mother's absence. The record reveals that Mother's counsel attempted to communicate with Mother throughout the case, even if these efforts were not always successful. As to Mother's counsel deciding to proceed without Mother at trial, Mother must accept the responsibility for her absence. Also, it is certainly possible that Mother's counsel made a tactical decision that proceeding without Mother at trial would not hurt and might help Mother's case. In sum, we find that Mother has failed to demonstrate that she was deprived of any of her rights related to her representation or to fundamental fairness in the parental termination proceedings.

We next address whether the Trial Court erred in finding the ground of failure to visit. The question of Mother's visitation with the Children has been the subject of some confusion in the testimony. Grandfather kept detailed logs on Mother's visits, and he testified to this at trial. Initially, it was Grandfather's position that Mother visited only 17 times. However, it is evident from his own logs that Grandfather must have meant that Mother missed 17 visits, and actually visited 43 or 44 times. Grandfather acknowledges the mistake on appeal. However, even if we went with the lower figure of 17 visits in the relevant four-month period preceding the filing of the petition, as initially asserted, we would be hard-pressed to deem that token visitation. The evidence is not clear and convincing as to the ground of Mother's willful failure to visit, and therefore, we reverse the Trial Court as to the ground of willful failure to visit with respect to Mother.

We next address whether the Trial Court erred in admitting certain text messages. These were the text messages produced by Robert T. at trial purportedly showing that Mother engaged in illicit drug sales. This Court has stated with respect to the admissibility of evidence:

> The issues involve the correctness of the trial court's determinations of the admissibility of evidence. "Generally, the admissibility of evidence is within the sound discretion of the trial court." *Mercer v. Vanderbilt Univ.*, 134 S.W.3d 121, 131 (Tenn. 2004). "When arriving at a determination to admit or exclude even that evidence which is considered relevant trial courts are generally accorded a wide degree of latitude and will only be overturned on appeal where there is a showing of abuse of discretion ." *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn.1992).

> ***

> Tenn. R. Evid. 901 governs this issue and provides in pertinent part:

> (a) ... The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims.

*Bilbrey v. Parks*, No. E2013-02808-COA-R3-CV, 2014 WL 4803126, at **3, 14 (Tenn. Ct. App. Sept. 29. 2014), *no appl. perm. appeal filed*.

These text messages allegedly were deleted by Mother, then later recovered by the police, and then produced in court by Robert T. We have doubts as to the foundation laid for the admission of these text messages. Robert T.'s testimony on this issue was combative, defensive, and at times unclear. He was unable to recall precise dates and could only surmise that Mother sent or received these texts. Shawn G., Mother's father, testified at trial that a text did not resemble Mother's writing style, although he did respond to the message. Nevertheless, the standard here is abuse of discretion. The Trial Court evidently considered Robert T.'s testimony credible and sufficient to establish that the text messages were what they were claimed to be. Under the abuse of discretion standard, if reasonable minds can disagree about a particular discretionary decision, we will not disturb that decision. While a close question, we find no abuse of discretion in the Trial Court's decision to admit the text messages.

The significance of the text messages is that they could be interpreted to show that Mother earned money selling drugs, which could in turn support a showing of willfulness

in her failure to pay any child support. However, as noted by Mother at oral argument, the text messages perhaps better lend support to a conclusion that, if anything, Mother was a failed drug dealer. We find that the text messages, even accepting their authenticity and admission, are not dispositive to the issue of Mother's alleged willful non-support.

We next address whether the Trial Court erred in finding the ground of failure to support as to Mother. The Trial Court, as it did with Father on the same ground, emphasized heavily Mother's history with drugs. However, unlike Father's case, the evidence is silent as to Mother's means or capability to work during the relevant four month period preceding the filing of the petition to terminate parental rights.

Grandfather had the burden to prove that Mother could have paid child support during that four month window and willfully chose not to do so. We find no evidence in the record showing that Grandfather met his burden here. The fact that Mother had abused drugs and generally was irresponsible in her life cannot alone impute willfulness as to her non-support. Likewise, Mother's drug abuse and general irresponsibility did not shift the burden of proof as to willfulness from Grandfather to her. We reverse the Trial Court's finding of willful non-support with respect to Mother because there was no clear and convincing evidence proving willfulness during the relevant four month period. Because we reverse both grounds found against Mother, the issue of best interest is pretermitted as to her.

In summary, applying the standard of clear and convincing evidence, we affirm the termination of Father's parental rights to the Children on the ground of willful failure to support. We reverse the ground of willful failure to visit with respect to Father. We find further that termination of Father's parental rights is in the Children's best interest. We reverse both grounds for termination of parental rights found against Mother. Mother's successful defense of her parental rights to the Children on appeal necessarily entails that adoption of the Children by Grandfather also is reversed.

## Conclusion

The judgment of the Trial Court is affirmed, in part, and reversed, in part, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed equally against the Appellant, Christopher V., and his surety, if any, and the Appellee, Glenn V.

_____
D. MICHAEL SWINEY, CHIEF JUDGE